UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 25bk14411 |
| Tara Brown, | ) | Chapter 13 |
| Debtor. | ) | Judge Timothy A. Barnes |

TIMOTHY A. BARNES, Judge.

## MEMORANDUM DECISION

The matter before the court comes on for consideration on the Objection to Confirmation of Amended Chapter 13 Plan Filed February 22, 2026 (Docket 40) [Dkt. No. 60] (the "Confirmation Objection"), filed by Chicagoland Servicing, LLC ("Chicagoland"), in the above-captioned case. The Confirmation Objection is the second of two plan objections brought by Chicagoland. The first, Chicagoland Servicing LLC's Objection to Confirmation of Chapter 13 Plan Filed on September 18, 2025 (Docket 2) [Dkt. No. 16] (the "Original Confirmation Objection") was filed with respect to the Chapter 13 Plan [Dkt. No. 2] (the "Original Plan") of the debtor, Tara Brown (the "Debtor"). After the Debtor amended the Original Plan with the Amended Chapter 13 Plan [Dkt. No. 40] (the "February Plan"), Chicagoland asserted its Confirmation Objection as against the February Plan. The Debtor has since further amended the February Plan. Amended Chapter 13 Plan [Dkt. No. 63] (the "June Plan" and together with the Original Plan and the February Plan, the "Plans"). As the February Plan first addressed the Confirmation Objection and the June Plan then deleted that treatment, the court considers the Confirmation Objection as it relates to the more recent, June Plan.

The Confirmation Objection alleges that the Plans fail to comply with the confirmation requirements of section 1325 of the Bankruptcy Code by failing to provide for payment of postpetition property taxes, were not proposed in good faith and are not feasible. For the reasons more fully set forth below, the Confirmation Objection will be sustained, in part.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code.[1] 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under the Bankruptcy Code or arising in or related to cases under the Bankruptcy Code. 28 U.S.C. § 1334(b). District courts may refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section

---

[1] 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"). Throughout this Memorandum Decision, the court may also refer to the Federal Rules of Civil Procedure (the "Civil Rules" and, as to each, "Civil Rule ___") and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules" and, as to each, "Bankruptcy Rule ___").

157(a), the District Court for the Northern District of Illinois has referred all its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

A bankruptcy judge to whom a case has been referred has statutory authority to enter final judgment on any proceeding arising under the Bankruptcy Code or arising in a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the bankruptcy court may hear and determine such matters. 28 U.S.C. § 157(b)(1). As to the latter, the bankruptcy court may hear the matters but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1), (c). Absent consent, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

In addition to the foregoing considerations, a bankruptcy judge must also have constitutional authority to hear and determine a matter. *Stern v. Marshall,* 564 U.S. 464 (2011). Constitutional authority exists when a matter originates under the Bankruptcy Code or, in noncore matters, where the matter is either one that falls within the public rights exception, *id.*, or where the parties have consented, either expressly or impliedly, to the bankruptcy court hearing and determining the matter. *See, e.g.*, *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015) (parties may consent to a bankruptcy court's jurisdiction); *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) (noting that "implied consent is good enough.").

An objection to a bankruptcy plan may only arise in a case under the Bankruptcy Code and is part of the process to confirm a plan, which is a core proceeding. 28 U.S.C. § 157(b)(2)(L); *In re Williams*, 583 B.R. 453, 455 (Bankr. N.D. Ill. 2018) (Hunt, J.). The matter is therefore core and within the court's jurisdiction. "Such matters, thus, are within the court's constitutional authority. *Stern*, 131 564 U.S. at 500–01, 131 S. Ct. 2594." *In re Jones*, 679 B.R. 304, 308 (Bankr. N.D. Ill. 2026) (Barnes, J.).

Further, each of the parties has either expressly or impliedly consented to the undersigned's exercise of authority over this matter and has not contested the jurisdiction or authority of this court to enter final orders in this matter. Accordingly, determination of the Confirmation Objection is within the scope of the court's jurisdiction, statutory and constitutional authority.

## ILLINOIS TAX LIENS, THEIR SALE AND THEIR TREATMENT IN BANKRUPTCY

In Illinois, "property taxes are due the year after the year in which they accrue, and a lien in favor of the county automatically arises at the beginning of the year in which the taxes accrue." *In re LaMont*, 740 F.3d 397, 400 (7th Cir. 2014) (citing Jeffrey S. Blumenthal & David R. Gray, Jr., *Tax Bills and Payments; Tax Sales and Redemptions; Miscellaneous Collection and Enforcement Matters and A Guide to Tax Deed and Indemnity Fund Proceedings,* Chapters 10 & 11 *in* Real Estate Taxation § 10.3 (IICLE 2012) (hereinafter, "Real Estate Taxation"); 35 ILCS 200/21-75.[2] The county has a "prior and first

[2] 35 ILCS 200, *et seq.,* referred to herein as the "Property Tax Code".

lien on the property, superior to all other liens and encumbrances … until the taxes are paid or until the property is sold under this Code." 35 ILCS 200/21-75.

When a taxpayer fails to timely pay property taxes as they came due, the process by which the state can recover on the delinquent taxes begins. 35 ILCS 200/21-75; *LaMont*, 740 F.3d at 400. That process includes the right under the Property Tax Code to sell its tax lien. 35 ILCS 200/21-75; *LaMont*, 740 F.3d at 400 ("[T]he most common method to collect delinquent taxes is via one of the 'tax sale' methods provided by the property tax code.") (quoting Real Estate Taxation, at § 10.20); *In re Robinson*, 577 B.R. 294, 299 (Bankr. N.D. Ill. 2017) (Barnes, J.) (the Property Tax Code provides counties in Illinois a process by which "its right to payment of delinquent real estate taxes may be monetized by the State through a sale.").

Selling delinquent property tax lien rights via tax sales is not a new concept to this court nor limited to Illinois. *See, e.g.*, *Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631 (2023); *LaMont*, 740 F.3d at 400; *Robinson*, 577 B.R. at 299. The *Tyler* case struck down a tax sale system very similar to that in Illinois. *Tyler*, 598 U.S. at 639. The ruling was applied to Illinois law by the District Court within the past year. *See Kidd v. Pappas*, Case No. 22-cv-07061, 2025 WL 3507374 (N.D. Ill. Dec. 8, 2025).

Prior to the *Kidd* ruling, in such a sale, the county first applied for a judgment and order of sale against the property with delinquent taxes. 35 ILCS 200/21-75. Then, after obtaining the judgment and order of sale, the county could then sell the tax lien at a tax sale. *Id.* Such a sale is not of the property itself, but rather "the County's tax lien on that property, as that is all the County has the authority to sell." *Kidd*, 2025 WL 3507374, at *13 (citing *Wheeler Fin., Inc. v. L. Bull. Publ'g Co.*, 2018 IL App (1st) 171495, ¶ 1, 129 N.E.3d 53, 57; *LaMont*, 740 F.3d at 400).

If the tax lien was sold, "the county loses its lien, and the tax purchaser receives a 'Certificate of Purchase.'" *LaMont*, 740 F.3d at 400; 35 ILCS 200/21-250. The lien becomes a "lien for taxes for the amount paid [and it] shall remain on the property, in favor of the purchaser, his or her heirs or assigns[.]" 35 ILCS 200/21-240; *see also LaMont*, 740 F.3d at 404 ("Illinois courts have consistently treated the tax purchaser's interest as a tax lien.") (citations omitted).

The tax sale process does not conclude when the tax purchaser obtains the Certificate of Purchase. The taxpayer has a "right of redemption;" whereby the taxpayer can pay the tax purchaser the statutory redemption amount owed within a set period of time (the "Redemption Period"). 35 ILCS 200/21-345; 35 ILCS 200/21-355. "Before the redemption period has expired, a property subject to a Certificate of Purchase still belongs to the delinquent taxpayer, legally and equitably." *LaMont*, 740 F.3d at 406 (citing *Smith v. SIPI, LLC* (*In re Smith*), 614 F.3d 654, 658–59 (7th Cir. 2010); *Phoenix Bond & Indem. Co. v. Pappas*, 194 Ill. 2d 99 (2000)); *see also A.P. Properties, Inc. v. Goshinsky*, 186 Ill. 2d 524, 529–30 (1999) ("the landowner remains personally liable for the taxes") (citing 35 ILCS 200/21-440).

Should redemption not occur within the Redemption Period, prior to the *Kidd* ruling, the purchaser was able to petition for a tax deed. 35 ILCS 200/22-30. If the purchaser was successful with such a petition, it obtained a tax deed which it could thereafter record. 35 ILCS 200/22-40. If a tax deed was obtained and recorded, the purchaser "becomes the owner of the property outright and all outstanding liens and mortgages are extinguished." *LaMont*, 740 F.3d at 401 (citing 35 ILCS 200/22-55). Until the tax deed is recorded, however, the property remains owned by the taxpayer. *In re Woodruff*, 600 B.R. 616, 630 (Bankr. N.D. Ill. 2019) (Barnes, J.); *Smith*, 614 F.3d at 659.

Should the taxpayer file for bankruptcy before a tax deed is recorded, therefore, the property in question becomes property of the taxpayer's bankruptcy estate. 11 U.S.C. § 541(a); *LaMont*, 740 F.3d at 405–06; *Woodruff*, 600 B.R. at 631; *Robinson*, 577 B.R. at 304–05. As a result, in a chapter 13 case, the taxpayer may treat such property under his or her bankruptcy plan, 11 U.S.C. § 1322; *LaMont*, 740 F.3d at 406; *Woodruff*, 600 B.R. at 627; *Robinson*, 577 B.R. at 305, and may treat the purchaser as a creditor of the bankruptcy estate. *In re Romero*, Case No. 25-2021, 2026 WL 2055582, at *1 (7th Cir. July 16, 2026); *LaMont*, 740 F.3d at 409; *Woodruff*, 600 B.R. at 628; *Robinson*, 577 B.R. at 305–06.

As this court has noted, there has been some difficulty in determining how such a tax purchaser's claim should be treated. *Woodruff*, 600 B.R. at 627; *Robinson*, 577 B.R. at 305–06. Prior to *Tyler* and *Kidd*, there was little question that the claim had two components: one arising from the right to receive the redemption amount should it be paid and a contingent one relating to the purchaser's right to enforce the tax lien and obtain ownership of the property. *Woodruff*, 600 B.R. at 630; *Robinson*, 577 B.R. at 305–06. As to that contingent claim, prior to the expiration of the Redemption Period, it appeared that there existed a high likelihood that the contingency will not come to fruition as the taxpayer can pay the redemption claim in full and extinguish the purchaser's contingent claim. After the expiration of the Redemption Period, however, payment of the redemption claim in full would not extinguish the contingent claim under applicable Illinois law. Thus, there appeared to be a high likelihood that after the expiration of the Redemption Period the contingency will come to fruition. This made the timing of the petition commencing the bankruptcy case in relation to the expiration of the Redemption Period crucial. *Woodruff*, 600 B.R. at 639; *Robinson*, 577 B.R. at 305.

Much of the reasoning in *Woodruff* and *Robinson* has been called into question by *Tyler* and *Kidd*, however. The District Court found that the loss of equity that occurs in a Property Tax Code sale is both an unconstitutional taking under the Fifth Amendment's Takings Clause and in violation of the Eighth Amendment's prohibition on excessive fines. *Kidd*, 2025 WL 3507374, at *19, 22. The District Court did not find that a tax sale cannot occur, however. Nor did it invalidate a purchaser's claim for the redemption amount. Instead, the ruling vitiates the government's right to keep the equity of a property in a tax sale and thus vitiates a purchaser's contingent claim which derives from the same.

## BACKGROUND AND PROCEDURAL HISTORY

Keeping in mind the foregoing, the limited facts of this matter are not disputed.[3] The Debtor owns property commonly known as 3502 S. Maple Lane, Hazel Crest, Illinois 60429 (the "Property").

---

[3] The court has taken into consideration any and all exhibits submitted in conjunction with the Confirmation Objection and the Debtor's Response to Chicagoland Servicing, LLC's Objection to Confirmation of Chapter 13 Plan Filed on February 22, 2026 [Dkt. No. 65] (the "Response"). Though these items do not constitute an exhaustive list of the filings in the above-captioned bankruptcy case, the court has taken judicial notice of the contents of the docket in this matter, including the Proof of Claim filed by Chicagoland. *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444, 455 n.5 (Bankr. N.D. Ill. 2011) (Goldgar, J.) (recognizing same).

Prior to the commencement of her bankruptcy case, on November 15, 2022, the Debtor failed to timely pay property taxes as they came due and subsequently Cook County, Illinois ("Cook County"), sold its tax lien to Midwestern Investors LLC ("Midwestern"). Official Form 410: Proof of Claim [Claim Dkt. 4A, as amended] (the "Proof of Claim"), Exh. B. Midwestern's Certificate of Purchase was later, on September 21, 2023, assigned to Fundpality II, LLC ("Fundpality"). *Id.* On March 21, 2025, Fundpality petitioned the Circuit Court of Cook County for a tax deed. *Id.* On October 24, 2025, before the Proof of Claim was filed, Fundpality assigned its Certificate of Purchase to Chicagoland. *Id.*, Exh. C.

On September 18, 2025, prior to the scheduled expiration of the Redemption Period on September 19, 2025, *id.*, Exh. C, and thus before a tax deed has been issued or recorded, the Debtor commenced the above-captioned bankruptcy case. Official Form 101, Voluntary Petition for Individuals Filing for Bankruptcy [Dkt. No. 1] (the "Petition").

Attached with the Petition were the Debtor's bankruptcy schedules (the "Schedules"). Included in those Schedules were Official Form 106A/B–Schedule A/B: Property ("Schedule A/B"), where the Debtor scheduled the Property with a value of $176,700.00, and Official Form 106D–Schedule D: Creditors Who Have Claims Secured by Property ("Schedule D"), in which the Debtor scheduled Midwestern's claim in the amount of $32,075.00. Chicagoland filed the Proof of Claim on account of that debt, asserting $32,943.56 as the amount due. Proof of Claim.

Also included in those Schedules were her income and expenses. Official Form 106I–Schedule I: Your Income ("Schedule I"); Official Form 106J–Schedule J: Your Expenses (as amended by Dkt. No. 36, "Schedule J").

In addition to her prepetition property tax delinquency, the Debtor has a track record of failing to file or pay her income taxes. *See* Official Form 410: Proof of Claim [Claim Dkt. 3, as amended] (the "IRS Claim"). The IRS Claim, as originally filed, evidenced unpaid annual income taxes for the tax years 2019, 2020, 2021, 2022, 2023 and 2024. *Id.* For each of the unpaid amounts, the IRS asserted that no return had been filed. *Id.* Further, the Debtor has failed to pay her postpetition taxes as they have come due, for which she remains liable. *Goshinsky*, 186 Ill. 2d at 529–30. According to the Confirmation Objection, there are two unpaid real estate tax installments: (i) the 2024 second installment due December 15, 2025, for $4,407.35 and (ii) the 2025 first installment due April 1, 2026, for $4,698.65, together totaling $9,106.00 (the "Owed Tax Installments").

The Debtor's poor track record appears to have continued in the bankruptcy case wherein she has failed to stay current on plan payments due under the Plans. Motion to Dismiss for Failure to Make Plan Payments [Dkt. No. 51] (the "Motion to Dismiss").

On September 18, 2025, the Debtor proposed her Original Plan. In the Original Plan, the Debtor proposed no assurances that she would pay her postpetition real estate taxes as they came due. In the Original Confirmation Objection, filed on November 4, 2025, Chicagoland argues that the Original Plan cannot be confirmed. Chicagoland argues the Original Plan does not meet the confirmation requirements under section 1325 of the Bankruptcy Code and lacks more mandatory language related to the payment of postpetition real estate taxes and an enforcement mechanism to ensure payment of the same.

On February 9, 2026, in an apparent attempt to address the Original Confirmation Objection, the Debtor filed the February Plan, in which she addressed her ongoing, postpetition property tax obligations as follows: "With respect to the property commonly known as 3502 Maple Lane, Hazel Crest, IL, the debtor will pay real estate taxes and hazard insurance premiums that are billed post-petition on or before their due dates." February Plan, § 8.1.

Seemingly unpersuaded that the February Plan language properly addressed its objections, Chicagoland filed the Confirmation Objection. In it, Chicagoland again argues that the February Plan does not meet the section 1325 confirmation requirements and the added section 8.1 language is not sufficient and more mandatory language is needed to ensure payment of the postpetition real estate taxes.

When it became clear that the February Plan did not assuage Chicagoland's fears, the Debtor further amended her plan by filing the June Plan, in which the language from the February Plan was removed. June Plan, § 8.1. Further, the Debtor filed her Response to the Confirmation Objection on February 22, 2026.

Herein lies the crux of the dispute. The Confirmation Objection revolves around how the Debtor handles, or allegedly fails to handle, the Owed Tax Installments and future postpetition real estate taxes that will continue to come due. Put another way, the question posed is whether and if so how the court can compel a debtor to add assurances to a chapter 13 plan to address her demonstrated failure to pay property taxes on both a prepetition and postpetition basis.

## DISCUSSION

The general issue presented by the Confirmation Objection is simple. Does the June Plan meet the confirmation requirements of the Bankruptcy Code, specifically sections 1325(a)(1), (3) and (6)? The Debtor, however, raises a gating issue that must be taken up first. That is, whether Chicagoland has standing to bring the Confirmation Objection. The court will consider that latter question first, followed by the initial, substantive issue.

### A. Standing

The Debtor argues Chicagoland lacks constitutional standing and is not properly a party in interest with the right to raise the Confirmation Objection. The Debtor, in raising this issue, demonstrates a fundamental misunderstanding of both standing and claims in bankruptcy proceedings.

Standing is the "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The question of standing "contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) (citation omitted).

The first strand, constitutional standing, contains three elements:

> (i) an injury in fact, which is an invasion of a legally protected interest that is concrete and particularized and, thus, actual or imminent, not conjectural or hypothetical; (ii) a

> causal relationship between the injury and the challenged conduct, such that the injury can be fairly traced to the challenged action of the defendant; and (iii) a likelihood that the injury will be redressed by a favorable decision.

*Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (citation modified)). Simply put, constitutional standing requires "(1) an injury in fact; (2) causation; and (3) redressability." *RK Co. v. See*, 622 F.3d 846, 851 (7th Cir. 2010) (citations omitted).

The second strand, prudential standing, is another hurdle an action must overcome. *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 540 (7th Cir. 2012) ("A complaint may meet the standards for constitutional standing, yet fail to overcome the prudential standing hurdles."); *FMC Corp. v. Boesky*, 852 F.2d 981, 988 (7th Cir. 1988) (describing the distinction between Article III standing and prudential standing). One of the prudential limitations on the exercise of federal jurisdiction includes, in general, that "the plaintiffs must assert their own legal rights and interests, and cannot rest their claims to relief on the legal rights or interests of third parties." *G & S Holdings*, 697 F.3d at 540. While a court must, on its own, raise questions of constitutional standing, it is "not obligated to do so with respect to prudential standing questions," although it can. *Id.* Prudential standing can be waived if not preserved. *Id.*; *but see MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 749 (7th Cir. 2007).

In addition to the above, in bankruptcy a party must have a third, narrower form of standing. *Cult Awareness Network, Inc. v. Martino* (*In re Cult Awareness Network, Inc.*), 151 F.3d 605, 607 (7th Cir. 1998). A party "must have a pecuniary interest in the outcome of the bankruptcy proceedings" to have standing. *Id.* (citing *In re Andreuccetti*, 975 F.2d 413, 416 (7th Cir. 1992)). The pecuniary interest rule, also known as the "person aggrieved" test or requirement, "insures that bankruptcy proceedings are not unreasonably delayed by protracted litigation by allowing only those persons whose interests are directly affected by a bankruptcy order to appeal." *In re DuPage Boiler Works, Inc.*, 965 F.2d 296, 297 (7th Cir. 1992). It "promotes judicial efficiency by ensuring that only those parties who are 'directly and adversely affected' by a bankruptcy order are able to challenge it." *In re Holly Marine Towing, Inc.*, 669 F.3d 796, 800 (7th Cir. 2012) (quoting *Fondiller v. Robertson* (*In re Fondiller*), 707 F.2d 441, 442 (9th Cir. 1983)). A pecuniary interest will be shown if the party can "demonstrate that the order diminishes the person's property, increases the person's burdens, or impairs the person's rights." *DuPage Boiler Works*, 965 F.2d at 297.

Here, the Debtor seems to raise the issue of prudential standing, although indirectly, because she argues it is Cook County, not Chicagoland, who is entitled to collect postpetition real estate taxes and who the Debtor is liable to. In other words, the Debtor argues that Chicagoland is asserting the interest of Cook County and not its own. *G & S Holdings*, 697 F.3d 534, 541 (7th Cir. 2012).

The problem with this argument is that it is directly contrary to how claims are determined in bankruptcy and the controlling, on point law in this Circuit regarding the same.

Chicagoland, as a tax purchaser, unquestionably has a claim in the Debtor's bankruptcy proceeding. *LaMont*, 740 F.3d at 409 ("[T]he tax purchaser holds a claim against the debtors that may be treated in bankruptcy."); *Robinson*, 577 B.R. at 305 ("[A] tax purchaser is clearly now a holder of a claim that may be treated under a plan.").

As the holder of a claim that can be (and is) treated under the Debtor's chapter 13 plan, Chicagoland is by definition a creditor of the Debtor's bankruptcy estate. 11 U.S.C. §§ 101(10)(A) & (B) (a creditor is an entity that has a claim against a debtor or an estate). As a creditor, Chicagoland has both statutory standing and prudential standing to be heard with respect to the confirmation of that plan. Section 1324 states specifically that "[a] party in interest may object to confirmation of the plan." 11 U.S.C. § 1324(a). While unlike in chapter 11, *see* 11 U.S.C. § 1109(b), there is no express definition of "party in interest" in chapter 13, the Seventh Circuit has applied section 1109(b) to other chapters under the Bankruptcy Code, *In re C.P. Hall Co.*, 750 F.3d 659, 661 (7th Cir. 2014), and the court sees no reason why that would not equally apply in chapter 13. As it stated, "party is someone who has a legally recognized interest in the debtor's assets, namely the debtor (or the trustee in bankruptcy, if as in this case there is a trustee) and the creditors." *Id.*

Further, the Seventh Circuit recently returned "to the complexities at the intersection of Illinois property tax sales and bankruptcy law," *Romero*, 2026 WL 2055582, at *1, and found that a tax purchaser also has a "tax claim" under section 511(a). *Id.* at *4.

Finally, even if Chicagoland were somehow found to not have standing here, the court has an independent duty to review a proposed chapter 13 plan for compliance under section 1325(a). *U.S. Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 277 (2010) (rejecting the Ninth Circuit's holding that the bankruptcy court, in the absence of an objection, should confirm a chapter 13 plan even if the plan violated provisions of the Bankruptcy Code) ("[E]ven if the creditor fails to object, or to appear in the proceeding at all … § 1325 instructs a bankruptcy court to confirm a plan only if the court finds, *inter alia*, that the plan complies with the 'applicable provisions' of the Code.") (quoting 11 U.S.C. § 1325(a)).

Thus, the court must consider whether the June Plan meets the requirements for confirmation under the Bankruptcy Code.

B. Confirmation of a Chapter 13 Plan

Chapter 13 is intended for any "individual with regular income[.]" 11 U.S.C. § 109(e). "The purpose of chapter 13 is to enable an individual, under court supervision and protection, to develop and perform under a plan for the repayment of his debts over an extended period." *In re Smith*, 848 F.2d 813, 816–17 (7th Cir. 1988) (quoting H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 118 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6079). "Chapter 13 debtors are permitted to keep their property, but they must agree to a court-approved plan under which they pay creditors out of their future income." *Hamilton v. Lanning*, 560 U.S. 505, 508 (2010) (citing 11 U.S.C. § 1322(A)(1); 28 U.S.C. § 586(a)(3)). A proposed plan is approved by the court subject to the applicable sections of the Bankruptcy Code.

Section 1325 of the Bankruptcy Code is clear that, absent an applicable objection under subsection (b), "the court shall confirm a plan if" all nine requirements set forth in subsection (a) are met. 11 U.S.C. § 1325(a); *Petro v. Mishler*, 276 F.3d 375, 377 (7th Cir. 2002). Section 1325 ensures "that a Chapter 13 plan … will be properly scrutinized by the bankruptcy court before the plan is confirmed, mitigating the danger of abuse." *In re Smith*, 286 F.3d 461, 466 (7th Cir. 2002) (quoting *Mason v. Young* (*In re Young*), 237 F.3d 1168, 1174 (10th Cir. 2001)). The court has an obligation to ensure the proposed plan conforms to the Bankruptcy Code, including the section 1325(a) requirements, even absent an objection.

Because the chapter 13 plan must comply with other applicable provisions of the Bankruptcy Code, the Supreme Court of the United States stated that "the Code makes plain that bankruptcy courts have the authority—indeed, the obligation—to direct a debtor to conform his plan to the requirements of §§ 1328(a)(2) and 523(a)(8)." *Espinosa*, 559 U.S. at 277; *see also In re Mammel,* 221 B.R. 238, 239 (Bankr. N.D. Iowa 1998) ("[W]hether or not an objection is presently lodged in this case, the Court retains the authority to review this plan and deny confirmation if it fails to comply with the confirmation standards of the Code"). *Espinosa*, 559 U.S. at 277 n. 15. The Seventh Circuit made the same observation, noting that when a bankruptcy court confirmed a debtor's chapter 13 plan, it "implicitly found, based on the totality of the circumstances, that her plan was proposed in good faith" even though there was no objection on the ground that it was proposed in bad faith. *Marshall v. Blake*, 885 F.3d 1065, 1082 (7th Cir. 2018), *overruled on other grounds by In re Wade*, 926 F.3d 447 (7th Cir. 2019).

Chicagoland objects to confirmation of the June Plan based on three subsections: Sections 1325(a)(1), (a)(3) and (a)(6). Having reviewed the June Plan and the Confirmation Objection, the court agrees that, other than these three subsections, the June Plan meets all of the requirements for confirmation. While the court will therefore consider each of these three subsections, as section 1325(a)(1) turns on whether a plan complies with the provisions of section 1325 and other applicable provisions of the Bankruptcy Code and thus will fail to be satisfied by a failure under 1325(a)(3) or (a)(6), *In re Shelton*, 592 B.R. 193, 215 (Bankr. N.D. Ill. 2018) (Barnes, J.), analysis on section 1325(a)(1) will be deferred until the end.

i. *Section 1325(a)(3)*

Section 1325(a)(3) is the good faith requirement. It requires as a precursor to confirmation for the court to determine that "the plan has been proposed in good faith and not by any means forbidden by law[.]" 11 U.S.C. § 1325(a)(3). Good faith is not defined in the Bankruptcy Code nor discussed in the legislative history but has been developed by case law. The good faith inquiry focuses on "whether the filing is fundamentally fair to creditors and, more generally, is the filing fundamentally fair in a manner that complies with the spirit of the Bankruptcy Code's provisions." *In re Love*, 957 F.2d 1350, 1357 (7th Cir. 1992); *see also Ravenot v. Rimgale* (*In re Rimgale*), 669 F.2d 426, 432–33 (7th Cir. 1982). *Rimgale* raises points which "ultimately merge into a generic 'totality of the circumstances' test." *Smith*, 848 F.2d at 818 (citations omitted). To determine if the plan has been proposed in good faith, the court therefore looks at the "totality of circumstances" and decides on a "case-by-case basis." *Love*, 957 F.2d at 1355.

The Debtor suggests that the court should limit its review of this and the other confirmation requirements to answering the following question: Can the Debtor make the payments under the June Plan? As the Debtor has budgeted for the payment of postpetition real estate taxes and the Debtor's Schedules I and J appear to indicate that the June Plan is feasible, the Debtor suggests that the court's inquiry must end.

The court believes, however, that *Marshall*, *Love*, *Smith* and *Rimgale* suggest a more broad-sweeping inquiry is also appropriate. The question of good faith asks more broadly whether it is fundamentally fair for Chicagoland's claim to be bound only to the rights afforded it under the June Plan while the Debtor, who has a proven propensity to fail to pay her taxes when due, is not just free to but is also likely to incur new, unpaid debts not so restrained. In such a circumstance, the

Debtor's new tax creditors would be free to pursue their rights under the Property Tax Code while Chicagoland could only act if the terms of the June Plan were violated.

Had the Debtor not had such an extensive history of failures in this regard, this disparity might be disregarded as part of the fundamental disparity in treatment between prepetition and postpetition claims. In light of the Debtor's extensive history, however, the court concludes that such a circumstance is fundamentally unfair to Chicagoland. Section 8.1 of the national chapter 13 form plan exists for circumstances such as these. It affords debtors the ability to add provisions to plans to address circumstances that fall outside the more straightforward requirements of section 1325 already addressed elsewhere in the plan.

The Debtor clearly knew of the ability to address this concern as she attempted to do so in the February Plan. Removal of the section 8.1 provision in the June Plan leaves this unaddressed and the court concludes that the result is fundamentally unfair to Chicagoland. Thus, the June Plan has not been proposed in good faith and fails to satisfy section 1325(a)(3). As a result, the Confirmation Objection is well taken under this ground.

ii. *Section 1325(a)(6)*

Chicagoland also asserts that the June Plan cannot be confirmed because it is not feasible. Section 1325(a)(6) requires that "the debtor will be able to make all payments under the plan and to comply with the plan[.]" 11 U.S.C. § 1325(a)(6). As a starting point, "feasibility turns on the 'particular circumstances of the plan and the case.'" *Marshall*, 885 F.3d at 1083 (quoting *In re Olson*, 553 B.R. 343, 349 (Bankr. N.D. Ill. 2016) (Schmetterer, J.)). It is a factual determination made on a case-by-case basis, but at a baseline certain facts must be present. For instance, a debtor's income must support the plan's proposed payments. *Id.* at 1083 ("While the feasibility requirement is not rigorous, the plan proponent must, at minimum, demonstrate that the Debtor's income exceeds expenses by an amount sufficient to make the payments proposed by the plan.") (quoting *Olson*, 553 B.R. at 348); *see also In re Lewis*, 459 B.R. 281, 290 (N.D. Ill. 2011). A slight discrepancy may not be enough to cause a proposed plan to fail the feasibility requirement because minor adjustments to a debtor's monthly expenses may resolve the deficiency and thus the feasibility objection. *Olson*, 553 B.R. at 348.

Chicagoland argues both the Debtor's own filings and her actual performance in the case demonstrate that the June Plan is not feasible. It argues the June Plan is not feasible because the Debtor does not have sufficient net income after making plan payments to account for any contingencies nor to pay postpetition real estate taxes. In support, Chicagoland directs the court to Schedule I and Schedule J and the pending Motion to Dismiss.

The court disagrees with the first assertion, that the Debtor's own filings demonstrate that the June Plan is not feasible. The Debtor's budget shows she can make the proposed plan payments. The Debtor has a monthly income of $7,256. Schedule I. Her monthly expenses total $5,756. Schedule J. As a result, she has monthly net income of $1,500. Plan payments are currently $1,500 per month and will remain the same for the remainder of the June Plan term. Chicagoland's feasibility objection is because there is no room for the Debtor to account for any contingencies. It argued in the Confirmation Objection that the "narrow margin does not demonstrate a realistic and sustainable ability to perform." Confirmation Objection, at p. 10. While there is clearly a narrow margin by which the Debtor can make plan payments based on her budget, the math demonstrates

she can. And should her expenses rise, it may still be possible to make minor adjustments to resolve any such hypothetical deficiency. *See Olson*, 553 B.R. at 348. Therefore, the Debtor's budget supports, albeit narrowly, her ability to make the proposed plan payments. *Marshall*, 885 F.3d at 1083; *Lewis*, 459 B.R. at 290.

The court, however, is concerned with the second assertion that the Debtor's actual performance in the case demonstrates that the June Plan is not feasible. The court is not simply a rubber stamp for plans that look good on paper. There must also be consideration paid to practical feasibility. The Debtor's actions during the case make it a close call on whether section 1325(a)(6) is satisfied as a practical matter. The Debtor has not been making plan payments, as is evidenced by the pending Motion to Dismiss. Thus, while the Debtor *can* make the payments, her history shows that she most likely *won't*. Unfortunately, that determination is not clearly within the bounds of section 1325(a)(6).

It can, however, be considered in the context of good faith under section 1325(a)(3). The Debtor's poor performance history is in that regard a further reason why the June Plan does not meet the good faith requirement.

As a result, while the Confirmation Objection is not well taken under this ground under section 1325(a)(6), the court considers the Debtor's performance history as another reason why the June Plan does not meet the requirements of section 1325(a)(3). It is important to note that the Debtor's prepetition performance, while concerning, would not alone have carried the day. Bankruptcy is about fresh starts and to deny a debtor a fresh start because of past difficulties would defeat the purpose of the system. However, a debtor is not entitled to multiple fresh starts within a single case. The Debtor's postpetition performance and failure to institute reasonable safeguards against the same are compelling circumstances here.

iii. *Section 1325(a)(1)*

As noted above, the failure of the June Plan to satisfy section 1325(a)(3) alone constitutes a violation of section 1325(a)(1).

In addition to that, however, Chicagoland argues that its payment of the Owed Tax Installments has resulted in an administrative expense and the failure of the June Plan to provide for payment of the expense violates section 1325(a)(1) of the Bankruptcy Code. Chicagoland argues an administrative expense arises under either section 503(b)(1)(A) or section 503(b)(1)(B)(i) as such taxes are postpetition real estate taxes. As a result, Chicagoland argues that it must be paid that expense as a condition of confirmation. The Debtor disputes that section 503 requires such expenses to be paid prior to confirmation of the Plan because, as she argues, the statute is merely a mechanism to seek collection of administrative expenses. The Debtor further argues that, even if considered administrative expenses, Cook County is the only entity that can bring a petition to have the expenses allowed as administrative expenses.

Chicagoland is correct in that section 1325(a) provides that the court shall confirm a plan if, in part, it "complies with the provisions of this chapter and with the other applicable provisions of this title[.]" 11 U.S.C. § 1325(a)(1). An applicable provision of chapter 13 is section 1326, and it clarifies when certain payments must be made, providing that "[b]efore or at the time of each payment to creditors under the plan, there shall be paid—any unpaid claim of the kind specified in

section 507(a)(2) of this title …." 11 U.S.C. § 1326(b)(1). Section 507(a)(2) is for certain priority claims, including administrative expenses allowed under section 503(b). 11 U.S.C. § 507(a)(2). Although Chicagoland did not cite to section 1326, it did argue that administrative expenses must be treated in accordance with section 507. It follows that administrative expenses granted priority under section 507 must be paid in accordance with section 1326(b)(1) for plan confirmation. Therefore, a plan can only satisfy section 1325(a)(1) if it complies with section 1326(b)(1), even if not mentioned separately. *See In re Cherry*, 963 F.3d 717, 719 (7th Cir. 2020).

The dispute is putting the cart before the horse, however. Although Chicagoland argues the postpetition real estate taxes qualify as administrative expenses under either section 503(b)(1)(B)(i) or alternatively 503(b)(1)(A), it did not file such a request for payment and simply filed the Confirmation Objection. The first step to determine whether a payment is allowed as an administrative expense is to "timely file a request for payment of an administrative expense," so that there is "notice and a hearing[.]" 11 U.S.C. § 503(b); *In Re Falkner*, 178 F.4th 385, 391 (7th Cir. 2026) ("Creditors may (and perhaps should) file a request for payment instead of a proof of claim when seeking administrative expenses.").

Given the nature of property taxes, without such a request, it is impossible for the court to determine whether Chicagoland has a claim, an administrative claim or something else.

Section 503(b)(1)(A) allows an administrative claim for the "actual, necessary costs and expenses of preserving the estate[.]" 11 U.S.C. § 503(b)(1)(A). Section 503(b)(1)(B)(i) allows an administrative expense claim for "any tax—incurred by the estate, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except a tax of a kind specified in section 503(a)(8) of this title[.]" 11 U.S.C. § 503(b)(1)(B)(i). In general, "a claim will be afforded priority under § 503 if the debt both (1) 'arise[s] from a transaction with the debtor-in-possession' and (2) is 'beneficial to the debtor-in-possession in the operation of the business.'" *In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984) (quoting *Cramer v. Mammoth Mart, Inc.* (*In re Mammoth Mart, Inc.*), 536 F.2d 950, 954 (1st Cir. 1976)). Here, the Debtor continuing in the Property could be determined to be a necessary expense toward successful performance of the chapter 13 plan and, as such, those taxes (to the extent postpetition in nature) may be administrative. *Cf. In re Steenes*, 942 F.3d 834, 839 (7th Cir. 2019) (holding that postpetition vehicle fines incurred by debtors are administrative expenses owed to the City of Chicago).

The timing of those taxes, however, is undetermined. The Owed Tax Installments are for two property tax installments. The 2024 second installment was due December 15, 2025, and the 2025 first installment was due April 1, 2026. The Debtor commenced this bankruptcy case on September 18, 2025, prior to the due date for both installments. While the Owed Tax Installments came due postpetition, the tax installments are not necessarily incurred postpetition. As explained above, in Illinois "property taxes are due the year after the year in which they accrue[.]" *LaMont*, 740 F.3d at 400. So, looking at the 2024 second installment, while due in 2025, it actually accrued in 2024, pre-petition, and is less likely to be an administrative expense claim.

Federal courts adhere to the party presentation principle whereby federal courts are not "roving commissions." *Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288 (2026). The court must "rely on the parties to 'frame the issues for decision' and decide 'only the questions presented.'" *Id.* (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375–376 (2020)). Further, advisory opinions are strictly prohibited. *Glenn v. Cavalry Invs. LLC* (*In re Glenn*), 542 B.R. 833, 840

n.9 (Bankr. N.D. Ill. 2016) (Barnes, J.) ("This court has no jurisdiction to issue advisory opinions.") (citing to *In re FedPak Sys., Inc.,* 80 F.3d 207, 211–12 (7th Cir.1996) ("A bankruptcy court, like any other federal court, lacks the constitutional power to render advisory opinions or to decide 'abstract, academic, or hypothetical questions.'") (quoting *1819, Ltd. v. Florida Dept. of Rev.* (*In re Inn on the Bay, Ltd.*), 154 B.R. 364, 367 (Bankr. S.D. Fla.1993))).

What the court can observe is that the June Plan does not provide any mention of paying real estate taxes that are billed postpetition, whether that be the Owed Tax Installments or otherwise. Schedule J accounts for real estate taxes and provides an estimated payment of $630 per month. It is not clear whether the Debtor is estimating for the Owed Tax Installments, future real estate taxes, or both.

As a result, the court concludes that the June Plan violates section 1325(a)(1) as it violates section 1325(a)(3) and makes no finding with respect to Chicagoland's assertion regarding the Owed Tax Installments. As the June Plan does not satisfy section 1325(a)(1), the Confirmation Objection is well taken under this ground.

C. Certification

One final note. The Debtor in the Response sought to have this court certify the matter on direct appeal to the Seventh Circuit under 28 U.S.C. § 158(d)(2)(A)(i)–(ii). Section 158(d)(2) "allows a bankruptcy court … to certify a bankruptcy court's order to the court of appeals, which then has discretion to hear the matter." *Bullard v. Blue Hills Bank*, 575 U.S. 496, 508 (2015). The bankruptcy court shall make the certification if "on its own motion or on the request of a party, determines that a circumstance specified in clause (i), (ii), or (iii) of subparagraph (A) exists[.]" 28 U.S.C. § 158(d)(2)(B)(i). Section 158(d)(2)(A) guides the court's determination and provides three disjunctive criteria that, if any one of which is satisfied, results in certification and the appropriate court of appeals having jurisdiction. 28 U.S.C. § 158(d)(2)(A). The Debtor argues only the first two. The first criteria is met if "(i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance[.]" 28 U.S.C. § 158(d)(2)(A)(i). The second criteria is met if "(ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions[.]" 28 U.S.C. § 158(d)(2)(A)(ii).

At a prior hearing before the court, however, counsel for both the Debtor and Chicagoland appeared and discussed the appropriateness of a direct appeal in light of the recent Seventh Circuit decision in *Romero*. The parties at that hearing on July 23, 2026, agreed that no direct appeal is necessary at this time.

Because the circumstances since the Response have changed, the court will not analyze the appropriateness of section 158(d)(2)(A). Should the Debtor change her mind, she may still make a request for a direct appeal "not later than 60 days after the entry of the judgment, order, or decree." 28 U.S.C. § 158(d)(2)(E).

CONCLUSION

For the reasons stated above, the Confirmation Objection will be sustained by separate order entered concurrently herewith.

Dated: August 17, 2026

ENTERED:

______________________________
Judge Timothy A. Barnes
United States Bankruptcy Court